**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:23-cv-191-MOC-DCK**

| | | |
|---|---|---|
| **ANDREW O'DARIUS ROLLINSON**, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| **JACOB HOVLEY** | ) | |
| **TOP TIER SOLAR SOLUTIONS, LLC** | ) | |
| **SAMUEL VAN WYNEN**, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc. No. 105) and Plaintiff's Motion for Partial Summary Judgment (Doc. No. 107). Having considered the motions and the parties' arguments, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion and **DENIES** Plaintiff's motion.

## I.   BACKGROUND

Plaintiff worked for Top Tier Solutions, LLC, from May 2, 2021, until February or March 2022 selling residential solar panels door-to-door in the Charlotte area. (Doc. No. 117-1 at 11). Plaintiff attended a training session on May 3 held by Top Tier. (Doc. No. 109-1 at 6). Jacob Hovley, one of Plaintiff's supervisors, guided participants in a training exercise designed to help salespeople navigate door-to-door sales. (Doc. No. 117-1 at 27). During a role-playing exercise, Plaintiff played the role of salesman and Hovley played the role of homeowner. (Id.). Plaintiff, in character, introduced himself as a salesman and Hovley, in character, "identified himself as

-1-

Frederick Douglass, Harriet Tubman and Sojourner Truth." (Id.). When Plaintiff, who is African American, asked Hovley why he identified himself as various prominent African American civil rights activists, Hovley stated that "we are in the South, you may encounter a racist on the doors and you will need to know how to respond." (Id.). Plaintiff finished the exercise and continued working for Top Tier. (Id. at 27–28).

From the beginning of Plaintiff's employment, Top Tier required its salespeople, including Plaintiff, to send their supervisors "daily reports," and assigned its salespeople certain geographic areas to knock on doors. (Doc. No. 109-3 at 1–9). On June 1, Top Tier introduced a new payment plan for its salespeople: if a salesperson worked at least 25 hours per week, generated at least three "sit-down" leads per week, and no deals closed during that two-week period, Top Tier would pay the salesperson a minimum of $50 for each hour worked plus a $200 gas bonus. (Doc. Nos. 12 at 16, 109-5 at 2–3). To implement this new plan, Top Tier required its salespeople to submit daily timesheets using a Quickbooks app that allowed its salespeople to track the number of hours they worked each day. (Doc. Nos. 109-5 at 2–3, 109-3 at 1–9).

On June 2, Hovley texted Plaintiff that he "need[ed] that daily report," and that he "can't be reminding [Plaintiff]" to submit the report each day. (Id. at 6). The following day, Hovley told Plaintiff that "Quickbooks time [was] going to be a requirement for [Plaintiff's] minimums starting tomorrow but you're free to knock where you want now." (Id. at 8). Nevertheless, Top Tier still directed Plaintiff where to knock on doors. (Doc. No. 11-2 at 20). Additionally, salespeople such as Plaintiff were not permitted to knock on doors before 12 p.m. each day, except on Saturday. (Doc. No. 117-1 at 38).

Around this time, Plaintiff asked Top Tier's CEO, Samuel Van Wynen, about the new pay structure and the tracking app. (Doc. No. 109-5 at 2–3). Van Wynen responded that he did not need "daily reports," he just needed Plaintiff to submit his "T sheets everyday [he] work[ed]" using the new app. (Id.) Van Wynen added that he "[could] give [Plaintiff] freedom," but the tracking app was "non negotiable." (Id.).

Plaintiff and Van Wynen maintained a working relationship—Van Wynen would congratulate Plaintiff on new sales and leads, send motivational messages telling Plaintiff to "[g]o smash it," and tell Plaintiff that he missed the "tsunami of leads" Plaintiff used to bring in. See (Doc. No. 109-13 at 1–2).

On August 11, Plaintiff signed an updated Sales Representative Agreement. (Doc. No. 20-2 at 1). The Agreement provided that:

- Top Tier agreed to hire Plaintiff as a sales representative "in such geographic area . . . as [Top Tier] may determine."

- Plaintiff would be compensated consistent with the payment schedule in Exhibit A to the Agreement, which in turn set forth (1) how payments would be credited to Plaintiff and (2) the $50 minimum hourly payment plan Top Tier enacted on June 1. The Agreement also said that Top Tier could modify the payment schedule at any point thereafter.

- Plaintiff must work at least 25 hours per week, although the Agreement did not place restrictions on when or how the work hours could be completed. The Agreement also dictated that Plaintiff would use any applications or sales

tools required by Top Tier, and that failure to do so could result in termination.

- Plaintiff would be an independent contractor and have certain duties, such as tax reporting, consistent with that status.

- Plaintiff would not compete with Top Tier in the same area where Top Tier operated (or had plans to operate in) during his employment and for two years thereafter.

- Either party could terminate the Agreement upon 7 days' notice, although Top Tier could terminate Plaintiff without notice for "cause," which included conduct that "reflects unfavorably upon [Plaintiff]" or for "breach[ing] the Code of Conduct."

- Plaintiff consented to undergo a background check and be subject to mandatory drug testing without advance notice.

- Plaintiff must obtain his own auto and work-related insurance.

- Plaintiff may not assign his duties under the Agreement to a third-party without Top Tier's prior written consent, which it may withhold at its sole discretion. However, Top Tier could assign its duties under the Agreement freely.

- Top Tier's failure to enforce a provision in the Agreement would not constitute a waiver of such term.

(Id. at 2–11).

Plaintiff had a falling out with Van Wynen on August 27–28 regarding his pay. (Doc. No. 109-18 at 2–6). On August 27, Plaintiff asked Van Wynen when his commission for a completed install would "hit [Plaintiff's] account." (Id. at 2). Plaintiff attached screenshots showing that installation was supposedly complete. (Id. at 2–5). Van Wynen explained that Plaintiff could pick up his check from Top Tier that day, but that he did not control or know when G3, one of Top Tier's partners, would send Plaintiff the rest of his commission. (Id. at 2–5). Plaintiff responded that "[Plaintiff] does not control [G3's payroll] either my man, but if there's an issue with pay we reach out to you. This is an issue." (Id. at 5). Van Wynen texted Plaintiff the following message: "Here's the resolution. You'll get paid on [the project] next week. You'll get paid from Top Tier today when you come grab your check." (Id.). Plaintiff said "Ok cool, but y'all can't expect me to give 100% of my time and effort when they can't get the pay right. I got bills and a whole kid out here bro. That's all I'm saying." (Id. at 6). Van Wynen responded "Okay Andrew. Don't give 100% then." (Id.). Plaintiff texted Van Wynen back and said "Bet."[1] Id.). Van Wynen told Plaintiff to "Come grab your last check" and told Plaintiff that he "[did not] have time for [Plaintiff's] attitude." (Doc. No. 109-19 at 2). Plaintiff replied and stated:

> So is 'come grab your last check' official.. just for clarity sake and so there's no confusion. God forbid if someone asks you about their pay like you told us to, because 'no one cares about us getting paid more than you' your words. That's a toxic work culture if you get fired for making sure that your daughter has a roof over her head.

(Id.).

---

[1] The word "bet" as used in this situation carries a connotation similar to the phrases "you bet," "for sure," or "try me."

Van Wynen then uploaded a voice message to a group chat consisting of Top Tier's salespeople. Van Wynen indicated that Top Tier just fired a salesperson but did not identify Plaintiff. (Doc. No. 109-20 at 2). Van Wynen said that this person was "a prima donna," a "cancer," and was not "a team player." (Doc. No. 12). Van Wynen then referenced Michael Jordan when discussing why it was important to be a team player at Top Tier. <u>See</u> (<u>Id.</u>).

Plaintiff texted Van Wynen later that afternoon and said that "Jacob Hovley made a racist statement my first week in training and I said NOTHING lol, treated him with the utmost respect." (Doc. No. 110-1 at 2). At some point on this day, Top Tier removed Plaintiff's access to its systems.

Plaintiff texted Van Wynen once again the following morning, saying "Hey bro, as I say often, thanks so much for the opportunity. It really has been a pleasure. I remember many moments on this, my first, solar journey. Some include having a cracked tooth and knocking doors through intense pain, or getting a lead chat notification that one of my deals closed while at my daughter's bday celebration.. to name a few. I'll cherish them always. We made a great team. I wish yourself and Top Tier continued success and growth. Much love." (Doc. No. 11-2 at 61). Later that morning, Van Wynen texted Plaintiff and reversed course, saying that he was under a lot of pressure and he had a short fuse. <u>See</u> (Doc. No. 12 at 8). Plaintiff testified at a deposition that he did not believe he was fired, but that his termination was "threatened and [he] sought clarification." (Doc. No. 117-1 at 6–7). Although Plaintiff was not terminated and continued working for Top Tier, he did not have access to the tracking app and no longer logged his hours. Plaintiff also began working for another company, Piedmont Natural Gas. (Doc. No. 117-1 at 5).

-6-

Plaintiff continued working for Top Tier for months without issue. However, in January and February 2022, Plaintiff had another pay dispute with Top Tier. Plaintiff made a sale and installation had been completed, but Top Tier refused to pay Plaintiff. (Doc. No. 11-2 at 28–31). Plaintiff contacted Van Wynen to ask when he would receive his commission from the sale, and Van Wynen told Plaintiff to reach out to Austin Taylor, Top Tier's COO. (Id.). Plaintiff did so, and Taylor represented that Top Tier was withholding Plaintiff's commission because Plaintiff overcharged the customer. (Id.). Plaintiff told Taylor that Taylor would be hearing from Plaintiff's attorney. (Id.). Later that month, Plaintiff posted a google review of Top Tier saying that he was "independently contracted" with Top Tier and that the company was "willfully withholding thousands of dollars of [his] earned commissions, which is illegal." (Id. at 55). Top Tier responded to his review and called him "a former disgruntled employee." (Id.).

Plaintiff filed this lawsuit in 2023, asserting various state and federal causes of action. (Doc. Nos. 1, 12). The Court partially granted Defendants' motion to dismiss, leaving just three of Plaintiff's original claims alive: (1) race discrimination in violation of 42 U.S.C. § 1981 against Top Tier, Van Wynen, and Hovley based on (a) Hovley's comments during the role-playing exercise, (b) Van Wynen's statement that he could give Plaintiff "freedom," and (c) Van Wynen's reference to Michael Jordan in the voice message he sent to the group chat; (2) hostile work environment in violation of 42 U.S.C. § 1981 against Top Tier and Van Wynen based on the same conduct; and (3) improper withholding of wages under North Carolina's Wage and Hour Act, N.C. GEN. STAT. § 95-25.22, against Top Tier. (Doc. No. 48).

Plaintiff sat for a deposition in February 2026. Plaintiff stated that he did not think Van Wynen's reference to Michael Jordan in the August 2021 recording was a reference to Plaintiff.

(Doc. No. 117-1 at 17). Rather, he believed "it was a reference to Michael Jordan." (Id.). Plaintiff refused to answer whether Van Wynen's Michael Jordan reference was discriminatory, instead stating "[t]hat's a determination for the court." (Id.). Plaintiff similarly refused to opine as to whether he believed that Van Wynen's statement that he could give Plaintiff "freedom" was racially motivated. (Id. at 16). Plaintiff also admitted that his text message to Van Wynen after his threatened termination was the first time that Plaintiff told Van Wynen about Hovley's remarks during the role-playing exercise in May 2021. (Id. at 19).

Plaintiff moved for summary judgment on his Wage and Hour Act and hostile work environment claims, (Doc. No. 107), and Defendants moved for summary judgment on each of Plaintiff's three remaining claims. (Doc. Nos. 105, 106).

## II.   STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id.

In reviewing a motion for summary judgment, the Court "must review the record taken as a whole." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000) (citation modified). "However, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id. (citation modified).

The burden rests on the moving party to show both that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant makes such a showing, the non-moving party must point to "specific, material facts" in the record that give rise to "genuine issues." Sedar v. Reston Town Ctr. Prop., LLC, 988 F.3d 756, 761 n.3 (4th Cir. 2021); see id. "The evidence must be such that the jury reasonably could find for the nonmoving party." Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999). Although evidence need not be presented to the Court in admissible form, it must be capable of admission at trial. Mt. Valley Pipeline, LLC v. 0.47 Acres of Land, 853 F. App'x 812, 814 (4th Cir. 2021).

"A party's self-serving opinion cannot, absent objective corroboration, defeat summary judgment." CTB, Inc. v. Hog Slat Inc., 954 F.3d 647, 659 (4th Cir. 2020) (citation modified). Indeed, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Similarly, plaintiffs may not rely on mere allegations contained in their pleadings. Celotex Corp., 477 U.S. at 324.

Although pro se plaintiffs are "not entitled to a more lenient application of the substantive law," the Court is nevertheless cognizant of Plaintiff's pro se status and "has some obligation to consider for his benefit legal theories that might be applicable." Bell v. E. Davis Int'l, Inc., 197 F. Supp. 2d 449, 454 (W.D.N.C. 2002) (citation modified). "Principles requiring generous construction of pro se complaints are not, however, without limits. [Gordon v. Leeke, 574 F.2d 1147 (1978),] directs district courts to construe pro se complaints liberally. It does not require those courts to conjure up questions never squarely presented to them. District judges are not mind readers." Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985).

## III. DISCUSSION

### a. Defendants' Motion

#### i. Plaintiff's Racial Discrimination Claims

"Congress passed § 1981 to guarantee to all persons in the United States the same right to make and enforce contracts as is enjoyed by white citizens." <u>Nanendla v. WakeMed</u>, 24 F.4th 299, 305 (4th Cir. 2022) (citation modified). Plaintiff may prove his Section 1981 race discrimination claim by direct evidence of discrimination or under the burden shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). <u>Wannamaker-Amos v. Purem Novi, Inc.</u>, 126 F.4th 244, 255 (4th Cir. 2025).

> Under the <u>McDonnell Douglas</u> framework, a plaintiff must make out a prima facie case of discrimination. The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action. If the employer carries this burden, the plaintiff then must prove by a preponderance of the evidence that the neutral reasons offered by the employer were not its true reasons, but were a pretext for discrimination.

<u>Id.</u> (citation modified).

"To establish a prima facie case of discrimination, 'a plaintiff must show that (1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination.'" <u>Id.</u> (quoting <u>Sempowich v. Tactile Sys. Tech., Inc.</u>, 19 F.4th 643, 649–50 (4th Cir. 2021)). Plaintiff may not base his allegations on "labels, conclusions, recitations of a claims' elements and naked assertions devoid of further factual enhancement." <u>Nanendla</u>, 24 F.4th at 305. However, "[t]he burden at this stage is not onerous, and meeting it in effect creates a

-10-

presumption that the employer unlawfully discriminated against the employee." <u>Wannamaker-Amos</u>, 126 F.4th at 255 (citation modified).

Here, Plaintiff has failed to satisfy the fourth element of his prima facie case: that his adverse employment actions "occurred under circumstances that raise a reasonable inference of unlawful discrimination." <u>See</u> <u>id.</u> Plaintiff argues that there is a reasonable inference that he was terminated because of his race and points to three separate acts that he contends show racial prejudice. Plaintiff points to: (1) Van Wynen's text message saying that Van Wynen could give Plaintiff "freedom"; (2) the fact that Van Wynen referenced Michael Jordan, an African-American former basketball player, in the voice message he sent to employees immediately following Plaintiff's first "termination"; and (3) Hovley's role-playing exercise where Hovley played the role of prominent African-American civil rights leaders. Plaintiff is mistaken.

First, no reasonable jury could infer that Van Wynen's statement that he could give Plaintiff "freedom" had racial overtones, much less that it was indicative of racial discrimination. Van Wynen sent the text during a conversation regarding Plaintiff's apparent inability or refusal to comply with Top Tier's daily time sheet submission policy. Van Wynen's statement was clearly a reference to Plaintiff's working conditions, and no reasonable jury could think otherwise.[2]

Second, no reasonable jury could infer that Van Wynen's reference to Michael Jordan was racially motivated or racially discriminatory. Plaintiff agreed that Van Wynen never referenced Plaintiff in the voice message, saying in his deposition that the reference to Michael

---

[2] Furthermore, Plaintiff refused to say in his deposition whether Van Wynen's remark was racially motivated.

Jordan was not a reference to Plaintiff. And again, the context of the message makes clear that the reference was not racially motivated: Van Wynen was talking about how Top Tier employees needed to be team players like Michael Jordan. This was an obvious nod to Michael Jordan's widely known, and highly regarded, competitive attitude and proclivity for winning. Nothing about the statement was a reference to Plaintiff's race. No reasonable jury could conclude otherwise.

Finally, no reasonable jury could find that Hovley's role-playing exercise raises a reasonable inference that Plaintiff's adverse employment action was motivated by unlawful discrimination. Assuming that Plaintiff's pseudo-termination in August was an adverse employment action, Plaintiff admitted that Van Wynen, who took the adverse employment action against him, had no idea about Hovley's actions during the exercise. Thus, there is simply no reasonable connection between the exercise and Plaintiff's first "termination."[3]

Furthermore, no reasonable jury could conclude that the exercise had any bearing on Top Tier's decision to terminate Plaintiff's employment in February or March of 2022. The role-playing exercise occurred in May 2021, and Plaintiff's termination was in February or March of 2022. This eight- or nine-month gap is insufficient to infer causality between the two events. See Brown v. Cnty. of Mecklenburg, No. 3:22-cv-59, 2022 WL 1698642, at *3 (W.D.N.C May 26, 2022) (collecting cases and stating that "'[a]lthough there is no "bright-line rule" for temporal proximity, courts within our Circuit have found that shorter lapses of time similar to the three-month period at issue in the case before us are insufficient to infer a causal relationship without

---

[3] Furthermore, Van Wynen either reversed Plaintiff's termination or rehired Plaintiff after Plaintiff alleged that Hovley made racist statements during the role-playing exercise.

other evidence of a causal link'" (quoting <u>Roberts v. Glenn Indus. Grp., Inc.</u>, 998 F.3d 111, 127 (4th Cir. 2021))); <u>see also</u> <u>Hines v. Blue Cross & Blue Shield of N.C.</u>, No. 1:19-cv-754, 2020 WL 3452155, at **4–5 (M.D.N.C. June 24, 2020) (finding that the plaintiff could not rely on a five month gap between the protected activity and an adverse employment action to infer retaliatory intent); <u>Smith v. Astrazeneca Pharm. LP.</u>, No. 23-cv-1879, 2026 WL 741599, at *7 (D. Md. Mar. 17, 2026) (collecting cases and stating that "the Supreme Court and the Fourth Circuit have consistently found that, where a plaintiff relies on temporal proximity alone, more than a four-month gap is generally insufficient to establish causality").

And even if the Court could infer such causality, Top Tier has "articulate[d] a legitimate, non-discriminatory justification for its allegedly discriminatory action." <u>See</u> <u>Wannamaker-Amos</u>, 126 F.4th at 255. Plaintiff and Top Tier had a substantial pay dispute. Plaintiff accused Top Tier of withholding thousands of dollars in commissions, and Top Tier accused Plaintiff of overpricing solar units to boost his commissions at the expense of Top Tier's relationship with its customers. Plaintiff threatened legal action once Top Tier made this allegation and never worked for Top Tier again.[4] Top Tier contends that it terminated Plaintiff for this "legitimate, non-discriminatory" reason. <u>See</u> <u>id.</u> Plaintiff has not pointed to any evidence showing that Top Tier's stated rationale is pre-textual. Accordingly, Plaintiff has not carried his burden under the <u>McDonnell Douglas</u> burden shifting framework.

---

[4] The Court also notes that Plaintiff has not proffered any evidence showing that he performed, or attempted to perform, any work for Top Tier afterwards. Thus, Plaintiff has likely not shown that Top Tier actually terminated his employment. At best, it seems as though Plaintiff and Top Tier mutually parted ways pursuant to an unworkable business relationship. Nevertheless, the Court will assume that Top Tier terminated Plaintiff.

Plaintiff's hostile work environment claim meets the same fate. To state a Section 1981 hostile work environment claim, Plaintiff must show "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected characteristic]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 221 (4th Cir. 2016); Kenan v. Armada Hoffler Constr. Co., 3:18-CV-490, 2020 WL 998758, at *2 (W.D.N.C. Mar. 2, 2020). "A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Sanchez v. Whole Foods Mkt. Grp., Inc., No. 20-2327, 2022 WL 3369521, at *2 (4th Cir. Aug. 16, 2022) (quoting Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015)). "[T]he work environment must be both subjectively and objectively offensive." Kenan, 2020 WL 998758, at *2. "[P]laintiffs must clear a high bar in order to satisfy the severe or pervasive test." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). "Relevant considerations may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (citation modified). "Even conduct that would objectively cause hurt feelings or offense is not enough to be severe or pervasive." McIver v. Bridgestone Americas, Inc., 42 F.4th 398, 408 (4th Cir. 2022).

As stated above, only one of the three comments identified by Plaintiff was racially motivated. Because there can be no debate that the singular role-playing exercise was not

-14-

pervasive, Plaintiff must show that it was severe enough "to alter the terms and conditions of employment and create an abusive atmosphere." See Kenan, 2020 WL 998758, at *2. No reasonable jury could conclude that it was.

To be sure, there is no doubt that Hovley's statements were racially tinged. During the role-playing exercise, he answered the door as prominent African American civil rights leaders, without any sort of warning to Plaintiff. Caught off guard, Plaintiff asked why Hovley chose to answer the door that way, and Hovley explained that Plaintiff would likely encounter racists while knocking on doors and that he would need to know how to navigate such a situation.

Hovley did not comment negatively on Plaintiff's race or demean Plaintiff based on his race. He did not call Plaintiff names, disparage African Americans, or make any racist statements. Rather, Hovley acknowledged that African Americans face racism and wanted to ensure that Plaintiff was prepared for the prospect of encountering a racist individual while knocking on doors. Although Hovley likely could have found a better way to approach the training, the way he did does not constitute the type of severe race discrimination that courts have found to constitute a hostile work environment under Section 1981. See Brown v. Bratton, No. 21-1998, 2022 WL 17336572, at **9–10 (4th Cir. Nov. 30, 2022) (affirming the district court's determination that a supervisor's use of racial epithets in the employee's presence on two separate occasions did not constitute "severe" abuse sufficient to sustain a Section 1981 hostile work environment claim); Robinson v. Priority Auto. Huntersville, Inc., 70 F.4th 776, 783 (4th Cir. 2023) (finding that "race-based harassment," including the use of slurs and epithets, is "generally not severe or pervasive enough to create a hostile work environment"); see also Cuthbertson v. First Start Logistics, LLC, 638 F. Supp. 3d 581, 592–93 (W.D.N.C. 2022)

-15-

(finding that an employer telling an employee to "not be the angry black woman" was not sufficient severe under Section 1981).

Additionally, Plaintiff did not show that the statements were sufficient to "alter the conditions of [his] employment and create an abusive working environment." See Boyer-Liberto, 786 F.3d at 277. Plaintiff acknowledged that he carried on his work and never had any other issues with Hovley—by all accounts, the two continued working together without further issue.

Therefore, Plaintiff's hostile work environment claim will be dismissed.

### ii. Plaintiff's Wage and Hour Act Claim

Next, Plaintiff claims that Top Tier failed to pay him commissions in violation of North Carolina's Wage and Hour Act. Top Tier argues that Plaintiff is not entitled to such payments because he was an independent contractor and therefore not protected by the Wage and Hour Act.

"The [Wage and Hour Act] and the federal Fair Labor Standards Act ("FLSA") provide for recovery of an employee's unpaid wages from an 'employer.'" Powell v. P2Enterprises, LLC, 247 N.C. App. 731, 733 (2016). "The [Wage and Hour Act] is modeled after the FLSA." Id. at 733–34. "As such, in interpreting the [Wage and Hour Act], North Carolina courts look to the FLSA for guidance." Id. at 734 (citation modified). "An 'employer' is 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" Id. (quoting N.C. GEN. STAT. § 95-25.2(5); 29 U.S.C. § 203(d)). Courts are instructed to construe the term "employer" liberally because the purpose of the Wage and Hour Act is to protect workers. See id. Whether an individual is an independent contractor or an employee "turns upon the degree of control and direction one has over the daily work of an individual." Id. Critically, "[t]he right to

-16-

control, not necessarily the actual existence of control, is important." Id. (citation modified). In examining the right to control under the Wage and Hour Act, courts apply the "economic reality" test and examine "the totality of the circumstances to determine whether the individual has sufficient operational control over the workers in question and the allegedly violative actions to be held liable for unpaid wages or other damages." Id.at 734–35. "[C]ourts should examine any relevant evidence so as to avoid applying the test in a narrow, mechanical fashion." Id. at 735.

The North Carolina Supreme Court "has held that 'the right to fire is one of the most effective means of control' and that 'an independent contractor is subject to discharge only for cause and not because he adopts one method of work over another,' whereas 'an employee, on the other hand, may be discharged without cause at any time.'" McKenzie v. Charlton, 262 N.C. App. 410, 418 (2018) (citation modified) (quoting Youngblood v. N. State Ford Truck Sales, 321 N.C. 380, 385 (1988)). Other factors courts have considered include, but are by no means limited to, whether the individual

> (a) is engaged in an independent business, calling, or occupation;
> (b) is to have the independent use of his special skill, knowledge, or training in the execution of the work;
> (c) is doing a specified piece of work at a fixed price or for a lump sum or upon a quantitative basis;
> (d) is not subject to discharge because he adopts one method of doing the work rather than another;
> (e) is not in the regular employ of the other contracting party;
> (f) is free to use such assistants as he may think proper;
> (g) has full control over such assistants; and
> (h) selects his own time.

Id. at 414 (quoting Hayes v. Bd. of Trs. of Elon Coll., 224 N.C. 11, 16 (1944)).

Here, Plaintiff's Agreement and Top Tier's policies show that Top Tier had the right to significantly control Plaintiff's work:

1.  Top Tier could terminate Plaintiff for any reason with seven days' notice;

2.  Top Tier could modify Plaintiff's compensation schedule at any point;

3.  Plaintiff had to work at least 25 hours per week, and Top Tier limited the times of day that Plaintiff could complete that work;

4.  Top Tier could control the areas where Plaintiff knocked on doors;

5.  Top Tier required Plaintiff to submit daily time sheets;

6.  Plaintiff could not compete with Top Tier during his employment and for two years thereafter in the same areas where Top Tier operated or planned to operate;

7.  Top Tier had the right to drug test Plaintiff at any time without notice; and

8.  Plaintiff could not assign his duties under the Agreement.

These provisions and policies provided Top Tier with extraordinary control over Plaintiff's employment. One of the hallmarks of the independent contractor is that he can take his knowledge and skills and work for multiple people at the same time. However, the non-compete provision foreclosed Plaintiff from doing so. Additionally, Top Tier's ability to terminate Plaintiff without cause similarly deprived Plaintiff of a quintessential feature of the independent contractor relationship. See Youngblood, 321 N.C. at 385. Furthermore, Top Tier reserved the right to modify Plaintiff's compensation schedule at any point and without negotiation. Top Tier also controlled Plaintiff's day-to-day work: it required him to work for a certain number of hours each work during designated times and in designated areas; then, it required him to submit daily time sheets confirming his hours. It also required Plaintiff, a door-to-door salesman, to submit to

-18-

unannounced drug tests. Finally, the Agreement specifically stated that Plaintiff could be terminated for failing to comply with these provisions.

In rebuttal, Top Tier points out that the Agreement stipulated that Plaintiff was an independent contractor. However, the Court is concerned with Top Tier's functional ability to control Plaintiff's work, not labels designed to manipulate the employment relationship. Top Tier also contends that it did not control the hours Plaintiff worked or where Plaintiff worked, but that is simply not supported by the record at this stage of the proceedings. Indeed, Plaintiff showed that Top Tier limited the times that Plaintiff could knock on doors and that Top Tier assigned Plaintiff specific neighborhoods to canvass. Put simply, the indicia of control vastly outweigh the indicia of independence.[5]

Accordingly, Plaintiff was an employee, and Top Tier was his employer for purposes of the Wage and Hour Act.

### iii. Plaintiff's Admissions

Defendants contend that the Court should find that Plaintiff conceded his independent contractor status because Defendants asked Plaintiff to admit this fact in its request for

---

[5] Plaintiff and Top Tier's employment relationship seemed to change after his first "termination." That is, Top Tier stopped exercising the control over his work that it had before the "termination." However, the Court is concerned with Top Tier's <u>right</u> to control Plaintiff's employment, not whether it actually exercised that right. Viewed in the light most favorable to Plaintiff, Top Tier did not terminate Plaintiff on August 27 and, thus, the Agreement—the source of Top Tier's right to control Plaintiff's employment—remained in full force and effect throughout his term of employment. Furthermore, the Agreement states that its provisions would not be waived due to non-enforcement, so Top Tier's failure to exercise such control did not affect its right to do so. Thus, the Court can properly assume that Top Tier had the same right to control Plaintiff's work after the "termination" that it had before.

admissions, and Plaintiff did not respond until four months after the deadline to respond had

passed.

> Although Rule 36(a)(3) provides that a request is admitted if a party fails
> to timely respond to the request, a district court has broad discretion to find such a
> request not admitted. Nguyen v. CNA Corp., 44 F.3d 234, 242–43 (4th Cir. 1995).
> Even in cases with represented litigants, courts draw a distinction between late
> responses and a complete failure to respond: "[C]ourts are particularly responsive
> to allowing late answers to requests for admission when summary judgment is
> involved. . . . It does not further the interests of justice to automatically determine
> the issues of a lawsuit and enter summary judgment against a party because a
> deadline is missed." Lonewolf v. Garrett, No. 5:18cv00004, 2019 U.S. Dist.
> LEXIS 77290, at *16 (W.D. Va. May 7, 2019) (omission in original); see also
> Daimler Tr. v. Prestige Anapolis, LLC, No. 16-00544, 2017 U.S. Dist. LEXIS
> 112846, at *12 (D. Md. July 18, 2017) (stating that unanswered RFAs can serve
> as the basis for summary judgment but recognizing that, "in the posture of
> summary judgment, late responses should not be summarily rejected"). Courts are
> especially inclined to accept late responses to RFAs when pro se litigants are
> involved. Aramark Unif. & Career Apparel, LLC v. Hernandez, No. 7:16-cv-336,
> 2018 U.S. Dist. LEXIS 15189, at *7–8 (E.D.N.C. Jan. 31, 2018) (recognizing that
> a court's discretion to find RFAs not to be admitted "may be especially warranted
> in cases involving pro se litigants" and declining to deem the RFAs admitted
> where pro se defendant served late responses).

La Michoacana Nat., LLC v. Maestre, 611 F. Supp. 3d 87, 96 (W.D.N.C. 2020).

In deciding whether to deem a request for admissions to be admitted, courts in this circuit

have considered whether the requesting party was prejudiced by the receiving party's failure to

timely respond. See Aramark Unif. & Career Apparel, LLC, 2018 U.S. Dist. LEXIS 15189, at

*8; see also In re Savage, 303 B.R. 766, 773 (D. Md. 2003) (stating that "Federal Rule of Civil

Procedure 36 was not intended to be used as a technical weapon to defeat the rights of pro se

litigants to have their cases fairly judged on the merits"); Lonewolf, 2019 WL 2016708, at **5–6

(collecting cases allowing parties to file admissions late). "For purposes of Rule 36(b), prejudice

results where a party faces difficulty in proving its case because of a sudden need to obtain

evidence required to prove the matter that had been admitted." <u>Lonewolf</u>, 2019 WL 2016708, at *5 (citation modified).

Here, the Court finds that Defendants were not prejudiced by Plaintiff's (very) late response to their request for admissions. Most of the specific admissions that Defendants point to concern Plaintiff's legal status as an independent contractor. <u>See</u> (Doc. No. 106 at 24). That is, they do not concern factual matters forming the basis of the independent contractor determination. Defendants were not prejudiced by Plaintiff's failure to admit a legal contention forming the basis of his claim.

Defendants were also not prejudiced by Plaintiff's failure to timely respond to their requests for factual admissions. All but one piece of evidence Defendants asked Plaintiff to admit concerned matters within their knowledge and control. Indeed, Defendants cannot seriously contend that they had no knowledge of their control over Plaintiff's employment. It is their policies, after all, that form the basis of the independent contractor determination. The sole fact Defendants wanted Plaintiff to admit that was not within Defendants' knowledge was whether Plaintiff paid taxes as an independent contractor, which is, at best, of minimal relevance to the independent contractor determination in this case. Furthermore, Plaintiff did eventually serve his admissions, and Defendant had the benefit of Plaintiff's admissions when it deposed him. In fact, Defendants specifically asked Plaintiff whether he paid taxes as an independent contractor and filed a brief in support of their summary judgment motion highlighting that fact. Suffice to say, Defendants were not materially, adversely impacted by Plaintiff's failure to timely send his admissions.

-21-

For these reasons, the Court will not deem Defendants' request for admissions to be admitted.[6]

### b. Plaintiff's Motion

Plaintiff moved for summary judgment on his Section 1981 hostile work environment claim and his Wage and Hour Act claim.

For the reasons set forth above, the Court will not enter summary judgment in favor of Plaintiff on his Section 1981 hostile work environment claim.

Additionally, summary judgment is inappropriate on Plaintiff's Wage and Hour Act claim. Plaintiff has set forth evidence showing that he was owed commission payments that Top Tier refused to pay, and Top Tier has set forth evidence showing that Plaintiff was not entitled to the commissions. Thus, there is a genuine issue of material fact concerning Plaintiff's Wage and Hour Act claims. Therefore, summary judgment is inappropriate, and this claim will proceed to trial. See Celotex Corp., 477 U.S. at 323.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. No. 105) and **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. No. 107).

### ORDER

---

[6] Because the Court ruled in Defendants' favor on Plaintiff's discrimination claims, the Court will not consider whether Defendants' request for admissions relating to those claims should be deemed admitted.

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 105) is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's Motion for Partial Summary Judgment (Doc. No. 107) is **DENIED**.

Signed: April 20, 2026

Max O. Cogburn Jr.
United States District Judge

-23-